**Springborn v. Springborn**

*Jill Gehman Koestel,* for plaintiff.
*Alan B. Ziegler,* for defendant.

KELLER, *J.,* February 23, 2009—The defendant/appellant in the above captioned case appeals this court's order of November 25, 2008 granting the parties a divorce

and equitably dividing the marital property. The current appeal was filed by appellant's counsel, Alan B. Ziegler, Esquire on December 26, 2008.

On January 7, 2009, this court issued an order pursuant to Pa.R.A.P. 1925(b) directing the appellant in the above captioned case to file of record and serve upon this court a concise statement of errors complained of on appeal no later than 21 days after the date of that order. The concise statement was filed on January 21, 2009 and raises a multitude of issues on appeal, indeed, it is not so concise a statement at all. Those issues, though long and containing run-on sentences that would cause an English professor to shudder on sight, are set forth fully below. They are:

"(1) Did the master and the lower court err in failing to fix the value of the marital home at 40 Beach Road, Mohnton, Berks County, Pennsylvania in the amount of $238, 000 as established by the expert testimony of James McDevitt, the value being fixed in October 2005 when the husband repaired said property and moved out of the property so that it could be sold when the market in October 2005 to sell real estate was very good, but thereafter Wife changed her mind, refused to sell the property, moved back into the marital property, brought cats into the property which urinated on the rugs in the property and delayed the sale of the marital property until she again changed her mind and desired to sell the property, at which time the real estate market had substantially weakened?

"(2) Did the master and the lower court err in concluding 'the master has averaged the (oral) offers that have been made on the house, and has determined that the average is $213,000. The master therefore believes it

would be equitable that the parties accept an offer for the house that meets or exceed [sic] the market value. The master believes that $213,00 [sic] is the market value of the home since it represents the results of five (oral) offers from five prospective buys in the open market?'

"(3) Did the master err in finding 'Husband has refused to agree to sell the property because he wants more money than potential buys are offering' and that Husband was 'at fault' in causing the property to have been on the market for an extended period of time?

"(4) The master and the lower court [erred] in finding 'regarding the $6,000 escrow account that was to be funded by Wife, the master realizes that the $6,000 is Wife's money, and not marital funds' when the above sum was the estimated equity in the marital property, where the Wife was deeded sole title to the marital property in return for escrowing the sum and sold said marital property for a profit and therefore Husband received no equity from sale of the marital residence.

"(5) Did the master and the lower court err in concluding 'the master therefore finds that since the payoff of the loans resulted in the $17,000.17 value as of April 20, 2005, the actual marital value of Wife's 401k plan as of the date of final separation is $13,256.23' rather then [sic] $27,000 as valued at time of trial?

"(6) Did the Honorable Scott Lash, the divorce master, and the Honorable Scott Keller err in failing to grant defendant's motion for summary judgment and err in failing to grant defendant's request for reasonable attorney's fees when the plaintiff filed a petition for special relief to force the specific performance for the sale of the marital property at 40 Beach Road, Mohnton, Berks

County, Pennsylvania without enclosing therein a written agreement of sale for the purchase of said property in violation of the statute of frauds and when she withdrew the petition for special relief to avoid the court granting the motion for summary judgment and when the master failed to award attorney's fees pursuant to the June 29, 2007 order of court?

"(7) Did the master and the lower court err in failing to award reasonable attorney's fees to defendant by using an improper analysis for whether to award attorney's fees? The factors to be reviewed in fixing attorney's fees are the payer's ability to pay, the requesting party's financial resources, the value of the services rendered and the property received in equitable distribution.

"(8) Did the master and the lower court err in considering the testimony of Ann Springborn, North West, Lee Savant and Rita Savant concerning alleged martial misconduct concerning arguments that the plaintiff and defendant had and other alleged incidents more thoroughly enumerated herein since the testimony did not rise to the level of being marital misconduct as set forth in section 3701 of the Divorce Code, was not relevant to the case and was the basis for the mater's [sic] justification of disregarding the testimony of the wife's continual sexual infidelity to Husband during the marriage?

"(9) Did the master and the lower court err in refusing to direct Lee J. Savant and Rita Savant to testify whether Linda Springborn, plaintiff, was a beneficiary of their will, a beneficiary of their life insurance policy, a beneficiary of their retirement, a beneficiary of their Keogh plan and/or a beneficiary of their pension plan?

"(10) Did the master and the lower court err in limiting the defendant/husband's alimony from his wife to two years based on the circumstances of the case where Husband showed an overwhelming case for alimony and when the master and the lower court considered improper testimony presented by the wife and because the master and the lower court refused to admit and consider relevant testimony?

"(11) Did the lower court violate due process and equal protection under the Pennsylvania and United States Constitutions after the defendant filed a 'motion to order production of transcription of record and refund of overpayment of transcription costs' when the court did engage in the following:

"(a) signed an 'order rule to show cause' scheduling an 'evidentiary hearing in disputed issues of material fact . . . to be held on May 6, 2008, at 1:30 o'clock p.m., in courtroom 9 of Berks County Courthouse,' but did not require the other parties to file an answer to the 'motion to order production of transcription of record and refund of overpayment of transcriptions costs' so that one could not determine what disputed facts had to be determined at the hearing;

"(b) failed to accept in the 'motion to order production of transcription of record and refund of overpayment of transcription costs' as admitted fact herein since no answers were filed to said motion;

"(c) failed to take testimony under oath;

"(d) failed to give the defendant credit in the transcription costs, appearance fee paid by plaintiff and defendant for July 17, 2007, August 17, 2007 and September 13, 2007 hearings so the defendant paid an excessive fee to have these records transcribed;

"(e) failed to set down the procedures for transcription costs of the master's hearing in Berks County so that the attorneys can have access to the same by setting them forth in the Berks County Rules of Courts and instead permit the stenographers randomly in each case to set their own fees;

"(f) placing the defendant with very limited funds in a difficult position to get the records transcribed so he can proceed with his appeal of the master's rulings by not setting forth a clear procedure to be followed in paying the stenographer's fee, in fixing how the stenographer's rate shall be set, and giving the parties credit for the appearance fees paid to the stenographers and did not permit defendant to present subpoenaed witnesses in this case?"

## PROCEDURAL HISTORY

Not unlike many cases this court has become accustomed to hearing, the Springborns' adventure began with nuptial bliss and ended with accusations and divorce. And, as it did with the lives contained in those tales, this court finds itself, yet again, in the unhappy circumstance of having to navigate the tumultuous waters between two warring parties, seeking to find equilibrium between Husband, Wife, and Lady Justice.

The divorce proceedings commenced on October 27, 2004 when Jonathan Batdorf, Esq. filed a complaint in divorce on behalf of Wife. Husband answered Wife's complaint with a counterclaim, including requests for equitable distribution of the marital property, and for spousal support and/or alimony pendente lite on April 28, 2005. Thereafter, Atty. Batdorf withdrew his appearance on behalf of Wife and Jill Gehman Koestel, Esq.

entered her appearance. Both parties then filed their inventory. On February 21, 2007 Atty. Koestel motioned for appointment of a regular/special master after which Gary S. Fronheiser was appointed on February 26, 2007. On June 22, 2007 Atty. Koestel filed a petition for special relief on behalf of Wife requesting this court order Husband to agree to the reduced price offered by a prospective buyer of the marital residence and to allow settlement to occur. She further requested this court order that any deficit paid by Wife at settlement be contained in the master's hearing scheduled for July 19, 2007, and that Husband pay Wife's attorney's fees for the filing of the petition for special relief. The court issued a rule to show cause and scheduled a hearing for June 29, 2007. Attorney Ziegler then promptly filed an answer to said petition. Subsequently, Husband filed a motion for summary judgment to dismiss petition for special relief on grounds that that parties were before Judge Scott Lash on Friday June 22, 2007 where Judge Lash indicated to Atty. Koestel that a proposed written agreement of sale must be provided, and that Atty. Koestel responded that Atty. Ziegler would have the proposed agreement the following Monday. No agreement arrived. It should be noted that the report of the special master later indicated that Mr. Whitman, a realtor presented by Wife, testified that he only had an oral offer from the prospective buyers, and no down payment, thus indicating that there was no agreement of sale for Ms. Koestel to forward to Mr. Ziegler. Mr. Whitman also noted that though he informed Husband of the offer, Husband never responded. Nonetheless, the following Tuesday another petition for special relief did arrive where again Wife requested the court order Husband to sign an agreement of sale. Atty. Ziegler

further alleged that the petition was filed in bad faith and again should be dismissed. Judge Lash issued an order on June 29, 2007 whereby he dismissed the petition for special relief as moot because the offer of sale had been withdrawn, and stated that any issue of attorney's fees could be raised with the equitable distribution master. Still seeing a need for the marital residence to be sold immediately, Atty. Koestel again filed a petition for special relief on July 26, 2007. Ms. Koestel requested this court order Husband to execute the agreement of sale at the price of $238,000 and to proceed to settlement, as well as award her $1,000 in attorney's fees. A rule to show cause was issued by this court and a hearing was scheduled for August 23, 2007. On September 4, 2007 this court issued an order providing that Wife should transfer to her counsel $6,000, and said funds should be held in an interest bearing account by Wife's attorney and Husband's attorney, and could not be withdrawn without the signature of both counsel. Further, Husband and Wife should execute a deed to the marital residence transferring the marital residence to wife with a receipt for the monies held in escrow, allowing wife to sell the property as she chose. Lastly, we ordered that the master should determine the distribution of the escrow account funds after the conclusion of testimony upon his submission of a report and recommendation. On December 10, 2007 Atty. Fronheiser filed his report and recommendation as special master.

Atty. Ziegler then filed 26 exceptions to the report and recommendation of the special master as well as a motion to extend time for paying for transcribing testimony before divorce master. This court issued an order scheduling a hearing for January 31, 2008 at 10:30 a.m. On

that date we denied defendant's motion to extend time for paying for transcribing testimony before divorce master. On February 7, 2008 Atty. Koestel filed a petition to dismiss defendant's exceptions for failure to comply with B.C.R.P. 1920.55. We granted said petition and dismissed defendant's exceptions for failure to comply with the rule. Thereafter, Atty. Ziegler filed defendant's motion to reconsider February 13, 2008 order of Scott D. Keller, J., dismissing exceptions to the master's report, noting therein that defendant had made a good faith effort to have the record transcribed but had contacted the wrong court reporting organization, as well as pointing out that Atty. Ziegler's mother passed away causing him to be out of the office for several days. By order of March 4, 2008 this court reinstated defendant's exceptions. On that same date, upon considering defendant's answer to petition for payment of divorce master, we granted the defendant six months to pay the master's fee.

On or about April 21, 2008 Atty. Koestel filed a motion to credit alimony pendent lite (APL) payments toward the final alimony award. On April 22, 2008 we ordered a rule returnable hearing to be held at the time of the exceptions date as would be set by further order of court. A hearing was held on May 6, 2008 after which we denied defendant's motion to order production of transcription of record and refund of overpayment of transcription costs. Never ceasing to file more lengthy documents, Atty. Ziegler filed an addendum to exceptions to the report/recommendation of Gary S. Fronheiser, Esq., divorce master on June 19, 2008, making the total number of exceptions filed 43, with some of those exceptions having multiple subparts. In response, we issued an order granting the motion to extend time for "paying for tran-

scribing testimony before divorce master and ordered Husband to pay the transcription costs within 90 days. We issued a briefing schedule on July 23, 2008, never expecting the massive briefs we would encounter in response. Attorney Ziegler filed his 77-page brief in support of his 43 exceptions on August 12, 2008 and Atty. Koestel filed her response brief on August 26, 2008. On September 24, 2008 Atty. Koestel filed a praecipe for argument. We scheduled argument on the exceptions on November 13, 2008. Subsequently, on November 21, 2008 we issued our discussion and order where we stated:

"Before the court were numbers [sic] exceptions filed by defendant to the report and recommendations of the master in divorce. This court has painstakingly reviewed every exception filed, the master's report, testimony presented, briefs of counsel and argument of counsel and have [sic] determined that the master performed his function thoroughly and in detail and applied the appropriate law and arrival at 'equitable' recommendations with regard to the division of property, counsel fees and alimony as well as a host of collateral issues raised primarily by defendant. We believe *NONE* of defendant's 40-plus exceptions have any merit and accordingly, we will sign the recommended divorce decree, however, due to intervening events we will order the following: And now, November 21, 2008, it is hereby ordered and decreed that Husband shall receive 65 percent of the actual proceeds from the sale of the marital residence and Wife shall receive 35 percent. Additionally, we find Husband's delay in failure to promptly pursue post-hearing procedures, delaying an ultimate decision by this court for a significant period of time to his benefit relative to APL, we order that Wife shall receive a credit toward alimony

payments ordered by the decree for three months of APL payments at $1,106.50 per month, total: $3,319.50. The domestic relations section is directed to effectuate an order for alimony for two years payable pursuant to the terms of the recommended divorce decree with Wife receiving the above credit. Additionally, the $6,000 escrowed by the parties with monies supplied by Wife shall be returned to Wife." (Discussion and order, 11/21/08 at 1-2.)

We signed the divorce decree on November 21, 2008. Thereafter, we signed an amended divorce decree on November 25, 2008. The decrees were identical except that the amended decree stated the correct year, 2008, whereas the original stated 2007. Defendant appealed the entry of the amended divorce decree to the Superior Court on December 26, 2008. On January 7, 2009, more than four years after the initial divorce complaint was filed, we directed the defendant to file a concise statement of matters complained of on appeal. Defendant did so on January 21, 2009, where he complained of the 11 issues aforementioned. We now address those issues.

## DISCUSSION

At the outset this court would like to voice its displeasure with Husband's failure to follow the Rules of Pennsylvania Appellate Procedure. Pa.R.A.P. 1925(b) states, "[i]f the judge entering the order giving rise to the notice of appeal (judge) desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal (statement)." The notes to that same rule indicate that such statements must also comply

with Pa.R.A.P. 2116, which states, "[the] statement of the questions involved must state the question or questions in the briefest and most general terms, without names, dates, amounts or particulars of any kind. It should not ordinarily *exceed 15 lines, must never exceed one page,* and must always be on a separate page, without any other matter appearing thereon. This rule is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby." (emphasis added) There is some appellate case law on this issue which suggests that complex cases may require more space than that prescribed by the rule, however this is not one such case. See *Eiser v. Brown & Williamson Tobacco Corporation,* 595 Pa. 366, 938 A.2d 417 (2007). Here, Husband simply appeals the signing of the divorce decree. We find it quite unnecessary for husband to raise 11 issues on appeal, some with multiple subissues to effectuate his purpose, as most of Husband's issues are copied word for word from the exceptions Husband filed, and we denied, to the report and recommendation of the special master. Unlike in *Eiser,* we do not have a "complicated [case] that involve[s] multiple issues worthy of arguing on appeal." *Id.* at 372, 938 A.2d at 420. On the contrary, we have a divorce involving a relatively small marital estate. Nonetheless, we will address the issues Husband has raised, but implore him to be more cognizant of the Pennsylvania Rules of Appellate Procedure before filing any documents.

(1) *Did the Master and the Lower Court Err in Failing To Fix the Value of the Marital Home at 40 Beach Road, Mohnton, Berks County, Pennsylvania in the Amount of*

*$238,000 As Established by the Expert Testimony of James McDevitt, the Value Being Fixed in October 2005 When the Husband Repaired Said Property and Moved Out of the Property So That It Could Be Sold When the Market in October 2005 To Sell Real Estate Was Very Good, But Thereafter Wife Changed Her Mind, Refused To Sell the Property, Moved Back into the Marital Property, Brought Cats into the Property Which Urinated on the Rugs in the Property and Delayed the Sale of the Marital Property Until She Again Changed Her Mind and Desired To Sell the Property, at Which Time the Real Estate Market Had Substantially Weakened?*

Husband first argues that the master and this court erred in failing to fix the value of the marital residence at $238,000, as he blames Wife for stalling the sale of the residence until the market softened. However, contrary to Husband's allegations, this court notes the time line provided by the master in his report which indicates that *both* parties, at one point or another, were responsible for failing to sell the residence in a timely manner. The master stated:

"[B]oth parties have acted at time to stymie a sale of this house. While Husband emphasized Wife's having cats in the house, which caused cat urine odor that would make the house less saleable, it appears that the cat odor problem, and the fixing of that problem, all occurred *before* the listing agreement was signed by both parties on September 17, 2006. There is no direct evidence as to when exactly Wife replaced the urine-stained carpets, but Wife said no offers on the house were received until she replaced the carpets. Wife did not provide an agreement of sale to Husband when she filed a petition for special relief on June 20, 2007. However, it appears that

an agreement of sale did not exist, and there was only a verbal offer which Wife said, in her petition that Husband had rejected. The court denied Wife's request for special relief, but not because an agreement of sale was not provided as Husband averred—it was denied because the offer to buy the house had been withdrawn. *Husband has refused to agree to a sale because he wants more money than potential buyers are offering, ignoring the advice of the parties' listing agent* . . . The master does not believe that one party or the other is more 'at fault' in causing this property to have been on the market for an extended period of time. *Both* parties have done things which have caused the property to be on the market for an extended length of time." (Report and recommendation of Gary S. Fronheiser, 12/10/07, at 9-10.) (emphasis added)

Thus, while Wife did contribute to the delay of sale, Husband did also. This court did not, and will not, sanction Husband's attempt to put all of the blame on Wife for the failure to sell this residence when the housing market was at its peak, noting again Husband's contribution to that delay, including but not limited to an offer to purchase the property for $238,000 gross on July 6, 2007, when Wife agreed to sign the agreement of sale and Husband did not respond to the offer. Had he done so he would have received the $238,000 he so ardently desires. Mountains of testimony were taken at the master's hearing, as to who did what, and who stalled the sale when, and whether oral offers were reduced to writing, yet we remain unconvinced that fixing the price on the house would be the proper thing to do. The fact of the matter is, the house *needs* to be sold, and delaying that sale in any way would do little to serve either party's interests.

This court endorses the master's findings and submits that neither the master nor the court erred in refusing to brand Wife as the only party who delayed the sale of the marital residence, thus not agreeing to "fix" the sale of the marital residence at $238,000.

Further, in considering the master's report this court notes that it has given the master's recommendations and reasoning great weight, as it is well settled that "a master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." *Moran v. Moran,* 839 A.2d 1091, 1095 (2003) (citing *Simeone v. Simeone,* 380 Pa. Super. 37, 50 n.3, 551 A.2d 219, 225 n.3 (1988)).

(2) *Did the Master and the Lower Court Err in Concluding "The Master Has Averaged the (Oral) Offers That Have Been Made on the House, and Has Determined That the Average Is $213,000. The Master Therefore Believes It Would Be Equitable That the Parties Accept an Offer for the House That Meets Or Exceed [sic] the Market Value. The Master Believes That $213,000 Is the Market Value of the Home Since It Represents the Results of Five (Oral) Offers From Five Prospective Buys in the Open Market?"*

Husband next argues that the master and the trial court erred in calculating the market value of the marital residence, reaching that value by averaging the offers made by five prospective buyers. We do not agree. The master's analysis is on point and states the following:

"[B]oth parties hired Mr. Whitman as their listing agent in April 2007, and the property was then listed at

$238,900. Mr. Whitman testified that real estate prices slumped by 5 percent since April, and 5 percent of $238,900 is $11,945, which means, using the original listing price as a guide, the current marketable price would be $226,955. The parties actually received an offer as of July 6, 2007 in an agreement of sale signed by prospective buyers for $238,000 gross/$223 [sic] net. Wife agreed to accept the offer, but Husband said he wanted to receive $235,900 [sic]. Further, Mr. Whitman said that since April, he has received and communicated to both parties verbal offers of: $210,000, $206,000, $220,000, $206,000, and the last offer of $223,000 (net). On June 29, 2007 Mr. Whitman prepared a market analysis (exhibit P-2) stating the house should be listed between $220,000-$225,000. However, it is not the listing price, but the *market value* of the house that must be determined, and there is nothing better in determining that value than actual offers from prospective buyers.

"The master has averaged the offers that have been made on the house, and he has determined that the average is $213,000. The master therefore believes that it would be equitable that the parties accept any offer for the house that meets or exceeds the market value. The master believes that $213,000 is the market value of the house since it represents the results of five offers from five prospective buyers in the open market . . . ." (Report and recommendation of Gary S. Fronheiser, 12/10/07, at 11.)

The testimony of two appraisers was also submitted. James Williams testified that the value of the marital residence was $225,000 in November 2005, and Michael McDevitt testified that it was $238,000 in October 2005.

(Divorce hearing, 9/13/07, at 125; divorce hearing, 8/30/07, at 214.) However, as witnesses for both parties testified the housing market has substantially softened. Thus, at the time the master issued his report and recommendation in 2007, and after considering the testimony of the parties' listing agent, it is a fair and reasonable assessment to calculate the *market value* of the property by averaging the figures that were *actually* offered for said property and not those values that the parties hoped they would receive. This court finds that Mr. Springborn's visions of grandeur as to the value of his property are completely unsubstantiated as it appears that the highest offer only netted $223,000, with *two* other offers netting as little as $206,000.

Further, the 2007 valuation by the master was indeed much more current than the appraisals done in 2005 soon after the parties separated, or even the value of the home as listed by the realtor in 2007. In *Sutliff v. Sutliff,* 518 Pa. 378, 380-84, 543 A.2d 534, 535-37 (1988), the Pennsylvania Supreme Court affirmed the decision of the Pennsylvania Superior Court, noting that "stale valuation data could lead to an unjust distribution of property" and moreover that "the valuation of marital assets should reflect values as of the distribution date, rather than the separation date." The Pennsylvania Supreme Court pointedly observed that:

"If . . . marital property values were to be fixed as of the date of the parties' separation, or as of the date of filing a complaint in divorce, severe injustices would at times be inflicted upon the parties concerned. Volatile market conditions and changing economic circumstances can render assets that had been valuable months or years earlier virtually worthless in the present, and vice

versa. Publicly traded securities may be worth a fortune one day, and a pittance the next. Privately owned business interests may be valued as a gold mine, or as a scrimption, depending on the times. . . . In view of these commonly recognized aspects of valuation it is difficult to conceive justification for the view that stale valuation data, *i.e.*, data that does not reflect values reasonably proximate to the date of distribution, should be used by the court in setting a distribution scheme." *Id.* at 383-84, 543 A.2d at 537.

If the parties were to choose a valuation sum higher than that suggested by the master, as Husband intimates, there is little question that parties would see an even greater loss in the value of their property as, based on the actual offers of five different parties, no one was willing to pay the sum hoped for by Husband and the marital residence would have remained on the market even longer. Instead, as the Supreme Court notes, stale valuation data creates an unjust distribution. Here, the more current value of the property is that offered by the five prospective buyers and averaged by the master, and not any other higher value previously suggested. Even Mr. Whitman, the parties' listing agent, stated "the fact that there have been five offers on the table, we're seeing a pattern of what the public is willing to pay for this property. And it seems to be in the 208 to 215 range, basically, is where it has been." (Divorce hearing, 7/19/07, at 29.) The fact of the matter remains that the true market value of a property is that which the public is willing to pay for it. And what the public is willing to pay for the marital residence, is that sum suggested by the master. For that reason, we agree with the master's findings and recommendation.

*(3) Did the Master Err in Finding "Husband Has Refused To Agree To Sell the Property Because He Wants More Money Than Potential Buys Are Offering" and That Husband Was "at Fault" in Causing the Property To Have Been on the Market for an Extended Period of Time?*

Husband's next issue misstates the master's report and recommendation and thus is entirely without merit. At the risk of being repetitive, though it appears that Husband requires such repetition as this issue is substantially similar to his first issue, the master stated:

"*[B]oth* parties have acted at time to stymie a sale of this house. While Husband emphasized Wife's having cats in the house, which caused cat urine odor that would make the house less saleable, it appears that the cat odor problem, and the fixing of that problem, all occurred *before* the listing agreement was signed by both parties on September 17, 2006. There is no direct evidence as to when exactly Wife replaced the urine-stained carpets, but Wife said no offers on the house were received until she replaced the carpets. Wife did not provide an agreement of sale to Husband when she filed a petition for special relief on June 20, 2007. However, it appears that an agreement of sale did not exist, and there was only a verbal offer which Wife said, in her petition that Husband had rejected. The court denied Wife's request for special relief, but not because an agreement of sale was not provided as Husband averred—it was denied because the offer to buy the house had been withdrawn. Husband has refused to agree to a sale because he wants more money than potential buyers are offering, ignoring the advice of the parties' listing agent. *The master does not believe that one party or the other is more 'at fault' in*

*causing this property to have been on the market for an extended period of time. Both parties have done things which have caused the property to be on the market for an extended length of time.*" (Report and recommendation of Gary S. Fronheiser, 12/10/07, at 9-10.) (emphasis added)

As we discussed previously, Husband *does* appear to want more money for the property, as evidenced by the testimony of Mr. Whitman, the parties' listing agent, who said that he contacted Husband in regards to an offer of $238,000 with a net amount of $223,000 and received no response. (Divorce hearing, 7/19/07, at 27.) Further, it is clear misreading of the text of the master's report and recommendation to suggest that the master blamed only Husband for the property being on the market for such an extended period of time. The facts speak for themselves. As much as Husband might like to shy away from the limelight in regards to this issue, the curtain impedes his departure from the stage. Initially, it is true that Wife delayed listing the house while she lived there, however, since the house has been listed, Husband too has delayed the sale by not responding to proposed offers and seeking to gain more money in an already depressed market. We decline to support Husband's disingenuous attempt to censure Wife when he too bears some fault.

(4) *The Master and the Lower Court [Erred] in Finding "Regarding the $6,000 Escrow Account That Was To Be Funded by Wife, the Master Realizes That the $6,000 Is Wife's Money, and Not Marital Funds" When the Above Sum Was the Estimated Equity in the Marital Property, Where the Wife Was Deeded Sole Title to the Marital Property in Return for Escrowing the Sum and Sold Said Marital Property for a Profit and Therefore Husband*

*Received No Equity From Sale of the Marital Residence.*

Husband next argues that he is entitled to a portion of the funds that Wife contributed to the escrow account. We disagree. We note that in *Schenk v. Schenk,* 880 A.2d 633, 639 (Pa. Super. 2005), the court stated:

"[O]ur standard for reviewing awards of equitable distribution is well settled. The trial court has broad discretion in fashioning such awards, and we will overturn an award only for an abuse of that discretion. To assess whether the trial court abused its discretion, we must determine whether the trial court misapplied the law or failed to follow proper legal procedure. Further, we measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights. *Hayward v. Hayward,* 868 A.2d 554, 557-58 (Pa. Super. 2005)"

Further, the law regarding what is, and is not, marital property is well settled in 23 Pa.C.S. §3501(a)(4), and states that, "'marital property' means all property acquired by either party during the marriage and the increase in value of any non-marital property acquired pursuant to paragraphs (1) and (3) as measured and determined under subsection (a.1). However, marital property does not include . . . (4) Property acquired after final separation until the date of divorce, except for property acquired in exchange for marital assets."

Here, Wife was ordered by this court in its order of September 4, 2007 to contribute the funds to the escrow account by August 28, 2007, long after the parties' final separation on February 1, 2005. As the funds used to contribute to that account were not marital funds when

contributed, they are likewise funds that Husband is not entitled to a portion thereof. The master provided in his report and recommendation that the $6,000 should be used to pay the mortgage balance and costs of sale that exceed the selling price of the marital residence, with Wife being liable for 65 percent and Husband being liable for 35 percent. (Report and recommendation of Gary S. Fronheiser, 12/10/07, at 28-29.) However, if the house sold for a profit Wife would receive her contribution back and the funds over and above the $6,000 would be divided according to the distribution scheme. *Id.* at 29. Evidentially, the parties *have* sold their residence, and sold it for a profit, though it does not appear that that profit exceeded $6,000; as such Husband did not receive anything from that sale. However, we also note that the record does not indicate that Husband contributed any funds to said escrow account, perhaps if he had, he would have received the share he contributed back as well. We believe that the $6,000 in the escrow account is non-marital because it was contributed after the parties' final separation, and therefore Husband is not entitled to any share of said funds.

(5) *Did the Master and the Lower Court Err in Concluding "The Master Therefore Finds That Since the Payoff of the Loans Resulted in the $17,000.17 Value As of April 20, 2005, the Actual Marital Value of Wife's 401k Plan As of the Date of Final Separation Is $13,256.23" Rather Then $27,000 As Valued at Time of Trial?*

Husband next argues about the valuation of Wife's 401(k) plan. Again, we cite well-settled law regarding what is, and is not, marital property. 23 Pa.C.S. §3501(a) (4), states that, " 'marital property' means all property

acquired by either party during the marriage and the increase in value of any non-marital property acquired pursuant to paragraphs (1) and (3) as measured and determined under subsection (a.1). However, marital property does not include . . . (4) *Property acquired after final separation until the date of divorce,* except for property acquired in exchange for marital assets." (emphasis added) Husband is *not* entitled to any increase in value of Wife's 401(k) plan after the parties' final separation in 2005. We see no reason why Husband should receive the benefits of Wife's hard work nearly two years after separation. We note with disapproval Husband's attempts to thwart Wife at each turn of the road, and to circumvent well-settled legal principles to effectuate his own interests.

(6) *Did the Honorable Scott Lash, the Divorce Master, and the Honorable Scott Keller Err in Failing To Grant Defendant's Motion for Summary Judgment and Err in Failing To Grant Defendant's Request for Reasonable Attorney's Fees When the Plaintiff Filed a Petition for Special Relief To Force the Specific Performance for the Sale of the Marital Property at 40 Beach Road, Mohnton, Berks County, Pennsylvania Without Enclosing Therein a Written Agreement of Sale for the Purchase of Said Property in Violation of the Statute of Frauds and When She Withdrew the Petition for Special Relief To Avoid the Court Granting the Motion for Summary Judgment and When the Master Failed To Award Attorney's Fees Pursuant to the June 29, 2007 Order of Court?*

Next, Husband raises the issue of attorney's fees. We do not believe Husband is entitled to said fees, but instead believe that Husband should be held responsible for the fees and filings of his own attorney, as Wife is respon-

sible for hers. In *Diament v. Diament,* 816 A.2d 256, 270 (Pa. Super. 2003) the Superior Court stated:

"Our ability to review the grant of attorney's fees is limited, and we will reverse only upon a showing of plain error. *Gilmore v. Dondero,* 399 Pa. Super. 599, [606,] 582 A.2d 1106, 1109 (1990). Plain error is found where the decision is based on factual findings with no support in the evidentiary or legal factors other than those that are relevant to such an award. *Id.* When reviewing the grant of attorney's fees, this court must take into consideration, the amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; the amount of money or value of the property in question; the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question. *Id.* [at 606, 582 A.2d] at 1109 (citing *LaRocca Estate,* 431 Pa. 542, 546, 246 A.2d 337, 339 (1968))."

Further, we do not believe that Husband has set forth justification for an award of attorney's fees under 42 Pa.C.S. §2503. Moreover, in reference to attorney's fees the master noted, "The master believes that Husband is under-employed, and that he could find other, more lucrative employment than his safe-selling business. His low income [of approximately $2,000 yearly] seems to be self imposed. It is with this in mind that the master is reluctant to award Husband attorney fees. Husband contracted with Atty. Ziegler to have Atty. Ziegler represent him. The contract is the first page of exhibit D-25, and

dated April 25, 2005. The contract sets forth the fees Atty. Ziegler charges Husband. There is no indication in the fee letter that attorney fees would be sought from another source. Husband squarely took on that responsibility." (Report and recommendation of the special master, 12/10/07, at 18.)

We agree with the master's recommendation, and affirm our own decision that attorney's fees are not warranted in this instance.

(7) *Did the Master and the Lower Court Err in Failing To Award Reasonable Attorney's Fees to Defendant by Using an Improper Analysis for Whether To Award Attorney's Fees? The Factors To Be Reviewed in Fixing Attorney's Fees Are the Payer's Ability To Pay, the Requesting Party's Financial Resources, the Value of the Services Rendered and the Property Received in Equitable Distribution.*

Next, Husband again argues the issue of attorney's fees, but in a different capacity. Quite to the contrary of Husband's assertion, this court indeed knows the standard for awarding attorney's fees as we are faced with the issue on a *daily* basis. However, in this instance, no attorney's fees were warranted. We believe no further discussion is necessary.

(8) *Did the Master and the Lower Court Err in Considering the Testimony of Ann Springborn, North West, Lee Savant and Rita Savant Concerning Alleged Marital Misconduct Concerning Arguments That the Plaintiff and Defendant Had and Other Alleged Incidents More Thoroughly Enumerated Herein Since the Testimony Did Not Rise to the Level of Being Marital Misconduct As Set Forth in Section 3701 of the Divorce Code, Was Not Relevant to the Case and Was the Basis for the Master's*

*Justification of Disregarding the Testimony of the Wife's Continual Sexual Infidelity to Husband During the Marriage?*

Husband appears to be intent on branding the scarlet "A" upon his wife's breast while at the same time seeking to shirk his own responsibilities for the parties' failed marriage, hoping to profit thereby. We disagree. Husband has misstated the master's report and recommendation, and has omitted the fact that the master not only addressed the issue of marital misconduct in regards to the award of alimony, but also addressed the other 16 factors pursuant to 23 Pa.C.S. §3701, considering *all* of the factors in making his recommendation. The master clearly did not disregard Wife's infidelity as he specifically discussed it in his report. (See report and recommendation of the special master, 12/10/07, 33-35.) However, the master also states, "It is clear that both parties committed marital misconduct. However, despite all the testimony and evidence about marital misconduct by both parties, *the master does not believe that issue is controlling.*" (*Id.* at 37.) As the master did not find that this issue was controlling, but instead considered all relevant factors in regards to the award of alimony, we sanction his recommendation and reaffirm our own denial of Husband's exceptions pursuant to this issue.

(9) *Did the Master and the Lower Court Err in Refusing To Direct Lee J. Savant and Rita Savant To Testify Whether Linda Springborn, Plaintiff, Was a Beneficiary of Their Will, a Beneficiary of Their Life Insurance Policy, a Beneficiary of Their Retirement, a Beneficiary of Their Keogh Plan and/or a Beneficiary of Their Pension Plan?*

Husband now asks this court to award him a portion of Wife's alleged and speculative inheritance, though there is no indication that Wife's parents suffer from ill health. Husband notes that the master prevented Wife's parents from testifying about their pension, retirement plan, life insurance policy and will. However, when considering the factors set forth in 23 Pa.C.S. §3701 the master clearly addresses the topic of expectancies and inheritances of the parties saying "Wife's parents are still alive, and they testified at the master hearing. They appear healthy. There is no indication that any inheritance Wife might expect from them would be imminent. To decide about any inheritance or expectancy she might receive from them, even if their current wills were before the master, would only be speculation. See *Powell v. Powell,* 395 Pa. Super. 345, 577 A.2d 576 (1990); *Mazzei v. Mazzei,* 331 Pa. Super. 432, 480 A.2d 1111 (1984). In *Gruver v. Gruver,* 372 Pa. Super. 194, 198, 539 A.2d 395, 397 (1988), the court states:

"[A] court may not consider the mere possibility of an inheritance by a spouse as a factor in the equitable distribution of marital property.

"The possibility of an inheritance, even if property inherited during marriage were marital property, and it is not, should not be a factor in making equitable distribution. Any possibility of an inheritance is too tenuous to attribute any weight to it. Parents have no legal obligation to leave property to their children and no matter what a person's intent concerning his will is today, it may change at any time and a subsequent will is essentially the revocation of an earlier will. *Crooks Estate,* 388 Pa. 125, 130 A.2d 185 (1957). See also, *Franey Estate,* 436 Pa. 94, 257 A.2d 515 (1969). Every person has the right

to dispose of his or her estate in any way that he or she sees fit. *Paul Estate,* 407 Pa. 30, 180 A.2d 254 (1962). It must also be recognized that in the face of ever increasing costs for the care of the elderly that even what appears to be a substantial estate today, may be quite diminished or even totally dissipated at the time of death, and finally, the actual life expectancies of both parents and child are unknown."

We believe this rule and rationale to be entirely on point. Wills *can* easily be changed, and we further note that beneficiaries of pensions and retirement accounts can also be easily changed. (Report and recommendation of the special master, 2/10/07, at 30.) While Husband continues to try to pry every penny from Wife's purse we cannot allow him to take this one. While *Gruver* discusses inheritances and expectancies in reference to equitable distribution, we believe the same rule applies to alimony. To increase Wife's alimony payments to husband based on speculative amounts of money that she may or may not receive sometime in the distant future would be inequitable and unfair to Wife. We agree with the master, as we did when we denied exception in the identical form as set forth above.

(10) *Did the Master and the Lower Court Err in Limiting the Defendant/Husband's Alimony From His Wife to Two Years Based on the Circumstances of the Case Where Husband Showed an Overwhelming Case for Alimony and When the Master and the Lower Court Considered Improper Testimony Presented By the Wife and Because the Master and the Lower Court Refused To Admit and Consider Relevant Testimony?*

The ambiguity of this issue prevents this court providing an in depth analysis when we are unsure of what

Husband considers to be "improper testimony presented by the wife," as well as what Husband believes to be "relevant testimony." However, we will address the soundness of the decision to limit alimony to two years. We are at a loss to determine what Husband believes is an "overwhelming case for alimony." The facts as presented to the master indicate that the parties were married for 13 years, and produced one child from the marriage. The child was then 12, but we assume he is 14 to 15 at this time. Further, that there is a clear differential in earning capacity between the parties, largely because of Husband's "apparent dedication to pursuing a floundering home business, using as a reason for his dedication to that business that Aaron[, the parties' high functioning autistic son,] needs him at home all the time, when the evidence shows that Aaron does not need his father near him every minute." (Report and recommendation of the special master, 12/10/07, at 37.) The master also pointed out two other controlling factors in that Husband needs healthcare, and that Dr. Rotenberg concluded that Husband would increase his job prospects through counseling. We support the master's analysis regarding the two-year recommendation of alimony. The master states:

"The master believes that Husband needs alimony, but for a shorter period of time and at a different amount, than Husband requests.

"Extrapolating from what Dr. Rotenberg said, and from what Husband said about his job interviews, the master projects that Husband would probably need about six months counseling as he looks for and finds a job. He may then need counseling for possibly another six

months as he becomes settled into a job, helping him become secure in his employment.

"After one year of counseling, the master believes that Husband may still need some financial support since he most likely will be receiving base-line wages. He may also have to secure a caretaker for Aaron at times, and he may also need some counseling during the second year. However, since Husband should by that time have been working for at least six months, his need for alimony will lessen.

"The master also sees no reason why Husband could not continue to pursue his safe-selling business while he pursues and starts a new job. It could become a part-time job for him. However, the master is convinced that Husband can hold a full-time job with benefits, which is important to his future.

"The master therefore believes that Husband should receive alimony for a period of two years, during which time the master anticipates that Husband would receive counseling and secure a job. In fact, the master anticipates that Husband would be able to get a job within six months, and that further counseling would help him maintain the job." (Report and recommendation of the special master, 12/10/07, at 38.)

We support the master's recommendation and analysis noting that after two years we see no impediment as to why Husband should continue to use Wife as a crutch, when, with counseling, he will be able to obtain his own gainful employment.

(11) *Did the Lower Court Violate Due Process and Equal Protection Under the Pennsylvania and United States Constitutions After the Defendant Filed a "Motion*

*To Order Production of Transcription of Record and Refund of Overpayment of Transcription Costs' When the Court Did Engage in the Following:*

(a) *Signed an "Order Rule To Show Cause" Scheduling an "Evidentiary Hearing in Disputed Issues of Material Fact . . . To Be Held on May 6, 2008, at 1:30 o'clock p.m., in Courtroom 9 of Berks County Courthouse," But Did Not Require the Other Parties To File an Answer to the "Motion To Order Production of Transcription of Record and Refund of Overpayment of Transcriptions Costs" So That One Could Not Determine What Disputed Facts Had To Be Determined at the Hearing;*

(b) *Failed To Accept in the "Motion To Order Production of Transcription of Record and Refund of Overpayment of Transcription Costs" As Admitted Fact Herein Since No Answers Were Filed to Said Motion;*

(c) *Failed To Take Testimony Under Oath;*

(d) *Failed To Give the Defendant Credit in the Transcription Costs, Appearance Fee Paid by Plaintiff and Defendant for July 17, 2007, August 17, 2007 and September 13, 2007 Hearings So the Defendant Paid an Excessive Fee To Have These Records Transcribed;*

(e) *Failed To Set Down the Procedures for Transcription Costs of the Master's Hearing in Berks County So That the Attorneys Can Have Access to the Same by Setting Them Forth in the Berks County Rules of Courts and Instead Permit the Stenographers Randomly in Each Case To Set Their Own Fees;*

(f) *Placing the Defendant With Very Limited Funds in a Difficult Position To Get the Records Transcribed So He Can Proceed With His Appeal of the Master's Rulings*

*by Not Setting Forth a Clear Procedure To Be Followed in Paying the Stenographer's Fee, in Fixing How the Stenographer's Rate Shall Be Set, and Giving the Parties Credit for the Appearance Fees Paid to the Stenographers and Did Not Permit Defendant To Present Subpoenaed Witnesses in This Case?*

Before addressing this issue we again would like to direct the appellant to the Pennsylvania Rules of Appellate Procedure as it is utterly clear that he has failed to read and comply with them. In the above issue, it is apparent that Husband has couched six issues in what should be only one issue. However, we will address this plethora of issues.

Husband first argues that this court erred by not directing Wife to file an answer to Husband's "motion to order production of transcription of record and refund of over payment of transcription costs." Husband is mistaken. Pa.R.C.P. 206.7(a) states, "if an answer is not filed, all averments of fact in the petition may be deemed admitted for the purposes of this subdivision and the court shall enter an appropriate order." The explanatory comment to that same rule notes that "[i]n the case of the failure to file or to timely file an answer, an appropriate order may not necessarily be one which is adverse to the defaulting party." Here, we thought an answer unnecessary, and issued our ruling accordingly. As we have properly followed the Pennsylvania Rules of Civil Procedure there has been no violation of either the Pennsylvania Constitution or the United States Constitution.

Husband next argues that we erred by not deeming all averments in Husband's "motion to order production of transcription of record and refund of over payment of transcription costs" as fact because Wife did not file an

answer to Husband's petition. Husband again fails to properly read the Pennsylvania Rules of Civil Procedure. Pa.R.C.P. 206.7(a) states, "[i]f an answer is not filed, all averments of fact in the petition *may* be deemed admitted for the purposes of this subdivision and the court shall enter an appropriate order." (emphasis added) Again, this court did not feel an answer by Wife was necessary. We held a hearing on the issue, heard argument, and denied Husband's motion because it lacked merit. We do not fault Wife's counsel for failing to file an answer to a clearly non-meritorious motion on behalf of Husband, saving Wife's counsel time, and Wife money. We also note that we did not require, nor request Wife file an answer to Husband's motion, but instead set a date for argument. Proper procedure was followed by this court and by Wife and her counsel, Jill Gehman Koestel.

Husband now argues that this court erred by not taking testimony under oath on Husband's "motion to order production of transcription of record and refund of over payment of transcription costs," however, this was not required by the Pennsylvania Rules of Civil Procedure, nor was it necessary. We held argument on the issue and Husband's counsel was given an opportunity to state his case. Taking testimony on a motion to order production of record and refund of over payment of transcription costs was unnecessary as there was no need to hear from outside parties on this issue. Doing so would have only served to waste more of this court's time causing the expenditure of valuable court resources better used in other matters.

In subdivisions (d), (e), and (f) of number 11, Husband turns this court's attention to stenographer's fees. He first claims that this court erred by not crediting the funds he

paid for the stenographer's appearance fee, towards the final cost of the transcription of testimony. This assertion appears to this court to be ludicrous. Husband is essentially arguing that the stenographer should appear, work until counsel is satisfied that all relevant testimony is on the record, and then not get paid for said work. We analogize the "appearance fee" to what Husband's counsel may call a "retainer fee." Simply, a sum of money paid to a party to handle a case, whether it be as counsel for one of the parties, or as the stenographer transcribing the testimony.

Husband then argues that this court violated the due process clauses of the Pennsylvania and United States Constitutions by not setting forth the costs of transcription in the local rules. However, this would not only be an impossible task, but would also be inefficient. The special master privately contracts with independent court reporting organizations for each hearing. Each of those organizations has their own set fees. Nevertheless, these fees can be easily ascertained by a simple ring of the telephone. Each organization has a set fee for a half day, a full day, and the cost of a transcript, per page, if one is requested. Had Husband done his homework it would have become crystal clear that the fees are not *randomly* set by each individual stenographer, but are instead set fees put forth by each individual firm in the manner set forth above. For this court, or any court, to mandate that each private firm should charge the same amount, as we would have to for said amount to be memorialized in the local rules of court, hinges on the absurd. It would be the same as this court ordering every doctor to charge his patients the same amount, or every lawyer to charge his clients the same amount, or any other private party

running an independent business to charge their clients the same amount. Husband's due process rights have not been violated and his argument lacks merit.

Finally, Husband argues, that by not setting forth the fees for transcription, he, as a man of limited resources, was put in a difficult position to get the record transcribed so that he could proceed with his appeal. We have already addressed the issue of fees above, thus we will proceed with addressing why a man of "limited resources" is required to pay his own transcription costs on *his* exceptions to the report and recommendation of the special master as well as on *his* appeal. First we note that Wife paid Husband alimony pendente lite. As such, besides his safe-selling business, Husband had another source of steady income. Further, Husband never petitioned this court to proceed in forma pauperis. We realize that transcripts are a costly endeavor for any party, however, we question how a court could proceed with its business without said transcripts. It is the burden of the excepting or appealing party to fund these costs, as it is on his exceptions, or appeal that the court halts its business to review the merits of what that party claims. Indeed, we wonder what divorcing party is not restrained by "limited resources" when paying costs and attorney's fees to litigate a divorce. To make an exception here because Husband claims he has "limited resources" would be economically unjust not only to Wife who has also had to pay to litigate this divorce over a period of several years, but also to all other parties forging ahead in this difficult economic climate.

Because we believe that Husband's appeal lacks all merit, and for all of the reasons set forth above, we respectfully request that Husband's appeal be denied.